UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EFRAIM GARCIA, #248959

        Petitioner,

                                    CASE NO. 2:07-CV-12108
v.                                 HONORABLE ANNA DIGGS TAYLOR

CARMEN PALMER,

        Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS BUT GRANTING A CERTIFICATE OF APPEALABILITY

**I.**    **Introduction**

This is a habeas case brought pursuant to 28 U.S.C. § 2254. Michigan prisoner Efraim

Garcia ("Petitioner") was convicted of two counts of first-degree premeditated murder, Mich.

Comp. Laws § 750.316, assault with intent to commit murder, Mich. Comp. Laws § 750.83, and

possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b,

following a jury trial in the Wayne County Circuit Court in 2002. He was sentenced to

concurrent terms of life imprisonment without the possibility of parole on the murder

convictions, a concurrent term of 20 to 40 years imprisonment on the assault conviction, and a

consecutive term of two years imprisonment on the felony firearm conviction.

In his pleadings, Petitioner raises claims concerning the effectiveness of trial and

appellate counsel, prosecutorial misconduct arising from the non-disclosure of evidence and the

presentation of allegedly false testimony, the cross-examination of a witness, his confrontation

rights and the admission of prior testimony and statements, the admission of gang evidence, and his right to counsel under the Vienna Convention. Respondent, through the Michigan Attorney General's office, contends that the petition should be denied because the claims lack merit and/or are barred by procedural default. For the reasons set forth herein, the Court denies the habeas petition, but grants a certificate of appealability as to Petitioner's non-defaulted ineffective assistance of trial counsel claim concerning counsel's pre-trial investigation.

II. <u>Facts</u>

Petitioner's convictions arise from a shooting in a residential neighborhood in Detroit, Michigan on July 17, 1994, which resulted in two deaths and a non-fatal injury. The Michigan Court of Appeals set forth the underlying facts, which are presumed correct on habeas review, *see Monroe v. Smith*, 197 F. Supp. 2d 753, 758 (E.D. Mich. 2001), *aff'd.* 41 F. App'x 730 (6th Cir. 2002), as follows:

> Defendant's convictions arise from the shooting deaths of Jimmie Goins and Annie Johnson, and the nonfatal shooting of Shirley Johnson. During the early morning hours of July 17, 1994, Shirley Johnson was at her home with her family when multiple gunshots were fired at their house. Jimmy Goins, who was sitting on the front porch, and Annie Johnson, who was inside the house, were both killed. Shirley Johnson, who was inside the house with Annie, was also struck by gunfire, but recovered from her wounds. According to Shirley, it sounded like more than one gun was involved in the shooting. Ballistic evidence recovered from the scene was consistent with the use of both a nine- and ten-millimeter handgun.

> Testimony at trial indicated that the shooting was gang-related and resulted from an earlier altercation between Jerry Waucaush and Ms. Johnson's nephew. Waucaush was the president of a gang known as the Cash Flow Posse. Defendant was an enforcer in that gang. One of the guns used in the shooting was an unusual ten-millimeter handgun and several witnesses linked defendant to that gun at the time of the shooting. Waucaush and another enforcer for the gang, Gregory Ballesteros, were originally charged in this matter, along with defendant. Waucaush and Ballesteros both agreed to plead guilty to reduced charges in exchange for their testimony against defendant. At trial, Ballesteros admitted to

2

participating in the shooting with defendant. Ballesteros testified that he first fired at Goins with a nine-millimeter handgun, and that defendant then ran up to the house and shot Goins with the ten-millimeter handgun as defendant stood over him. Defendant then fired several shots into the house, striking Annie and Shirley Johnson.

*People v. Garcia*, No. 246154, *1, 2004 WL 1620844 (Mich. Ct. App. July 20, 2004) (unpublished).  Additionally, this Court provides the following, more detailed account of the case history and trial testimony as relevant to the issues on habeas review.

The Detroit Police Department ("DPD") conducted an initial investigation of the Rutland Street shooting in 1994, but no charges were filed at that time.  In 1997, the Federal Bureau of Investigation ("FBI") took over the investigation as part of a federal investigation of the Cash Flow Posse and other Detroit gang activity.  Federal prosecutors instituted a Racketeer Influenced and Corrupt Organizations Act ("RICO") case against several gang members, including Petitioner, Jerry Waucaush, Robert Waucaush, Gregory Ballesteros, and Marty Rodriquez.  That indictment contained murder allegations arising from several incidents, including the Rutland Street shootings.  While the federal case was pending, the court appointed an investigator, Julianne Cuneo, to assist Petitioner with his defense.  She obtained copies of the FBI reports, including the DPD reports for the Rutland Street shooting, questioned witnesses, and took photographs.  During the federal proceedings, several people gave statements to the FBI and/or to a federal grand jury.  Jerry Waucaush, Gregory Ballesteros, and Marty Rodriquez pleaded guilty to certain charges and agreed to testify against Petitioner at trial.  However, the federal charges against Petitioner were subsequently dismissed on jurisdictional grounds in 2000 and the other defendants were allowed to withdraw their pleas.

In 2001, the State of Michigan charged Petitioner, Jerry Waucaush, and Gregory

Ballesteros with two counts of first-degree murder, assault with intent to murder, and possession of a firearm during the commission of a felony for the Rutland Street shooting. Shortly before trial, Jerry Waucaush pleaded guilty to second-degree murder and Gregory Ballesteros pleaded guilty to second-degree murder and felony firearm. Both agreed to testify against Petitioner at trial. Pursuant to their agreements, Waucaush was sentenced to 12 to 18 years imprisonment in federal prison and Ballesteros was sentenced to consecutive terms of 10 to 15 years imprisonment and two years imprisonment in federal prison.

At trial, Dr. Suwait Kanluen, the medical examiner, testified that 15-year-old Annie Johnson and 34-year-old James Goins died from multiple gunshot wounds. Annie Johnson suffered three gunshot wounds. Dr. Kanluen recovered bullet fragments from her brain and one bullet from her abdomen, which he gave to the police. James Goins suffered nine gunshot wounds. Dr. Kanluen recovered two intact bullets from his body, a copper jacket fragment, and a lead core fragment, which he gave to the police.

Detroit Police Officer Steven Yakimovich testified that he made a sketch of the crime scene and documented evidence. He recovered eight nine millimeter casings from the driveway and six ten millimeter casings from the front porch area of the victims' house.

Detroit Police Officer Karen Smith nee Patton, referring to her police report, testified that she responded to the shooting and found three victims. Victim Shirley Johnson had been shot twice and was crying and screaming. When she asked Johnson who could be responsible for the shootings, Johnson replied, "two Mexican males in their twenties, possible names Tony and Carlos."

Michael Crum testified that he was a member of a gang known as the Cash Flow Posse at

the time of the shooting.  He identified Jerry Waucaush as the president of the gang and

identified Petitioner and Gregory Ballesteros as enforcers for the gang.  According to Crum, the

enforcers killed people, collected dues, organized stuff, and responded to orders from Waucaush.

Crum testified that Petitioner's nickname was Gauge, Ballesteros' nickname was Shortstop, and

his nickname was Deuce.  Crum testified that he stole a ten millimeter Glock, an unusual gun,

from a fellow gang member in 1994.  He and Petitioner purchased ammunition for the gun from

the Gibraltar Trade Center.  He then test-fired the gun into a pine tree in the backyard of his

house.  In July, 1994, he was arrested and jailed for a weekend.  He had hidden the ten

millimeter gun under a couch at his house before his arrest.  When he was released from jail and

returned home, the gun was gone.  His sister told him that someone had come to get the gun.

When Crum asked Petitioner about the gun, Petitioner told him that "it was put up," which meant

that "it was hot, that it was used."  Crum admitted that he had spoken to the FBI and a grand jury

and that he been given immunity by the federal government for testimony about the Cash Flow

Posse.

On cross-examination, trial counsel impeached Crum with his prior statements.  Crum

admitted that he had previously lied to the FBI.  He also acknowledged that when he realized the

ten millimeter gun was gone, he first went looking for Gregory Ballesteros, but then spoke to

Petitioner about it.  On re-direct, Crum said that he initially lied to the FBI because he was afraid

of Petitioner and afraid that he would be killed.

Michael Crum's sister, Jennifer Estrada nee Crum, testified that her brother, Gregory

Ballesteros, and Petitioner were all members of the Cash Flow Posse.  When her brother was in

jail in July, 1994, Ballesteros and Petitioner came to her house and Ballesteros retrieved the ten

millimeter gun from under the couch. He and Petitioner then went into the dining room, wiped fingerprints off the bullets, and loaded the clips. She subsequently heard about the shooting on the news. When her brother came home from jail, she told him that Ballesteros and Petitioner had come to the house and taken the ten millimeter gun. Estrada acknowledged that she had spoken to the FBI and appeared before a grand jury. She admitted that she only told them that Ballesteros had come to retrieve the gun and did not implicate Petitioner because she was afraid of him. She said that she was given immunity by federal authorities.

On cross-examination, defense counsel impeached Estrada with her prior testimony. She admitted that she had not told the federal authorities that Petitioner came to her house to retrieve the gun, that he and Ballesteros cleaned any bullets, or that they already had weapons on them. On re-direct examination, Estrada recalled that she spoke to Petitioner after the shooting and he told her that the gun was put up and not to worry about it.

Ragaie Murfik testified that he was a member of a gang called the Camel Boys in 1989 and his gang reached a truce with the Cash Flow Posse in 1989 or 1990. He became friends with Jerry Waucaush, Gregory Ballesteros, and Petitioner. Murfik testified that he heard about the Rutland Street shooting from Marty Rodriquez, who was also a member of the Camel Boys. He thought that the intended targets were associated with a rival Folk Nation gang. Murfik further testified that within a month after the shooting, Petitioner came to his grocery store and tried to sell him a ten millimeter handgun. Murfik refused to buy the gun because he thought it had been used in the shooting.

On cross-examination, trial counsel questioned Murfik about his prior testimony in a proceeding involving Marty Rodriquez in which Murfik denied being a gang member. Murfik

admitted that he had previously lied under oath. Murfik also said that he was given a plea

bargain in federal court for a reduced sentence based on his agreement to testify against

Petitioner and others, but he already completed his whole sentence. Murfik admitted that he had

no personal knowledge of what occurred on Rutland Street.

Marty Rodriquez testified that he was currently in a federal prison serving 100 months

for a drug offense and said that he was brought to court against his will. He claimed that he

could not remember whether he was in a gang in the 1990s and could not recall anything that

anyone told him or anything that he told anyone about the Rutland Street shooting. The

prosecutor then impeached him with statements that he made to FBI Agent Richard Wozniak in

May and September of 1998 regarding Petitioner's comments to him about the shooting, *e.g.*,

that Petitioner had said that he had "done some shit on Rutland" and that he had shot people on

the front porch and inside the house, and the guns, *e.g.*, that Petitioner said he showed the ten

millimeter gun to Roger Murfik and that Petitioner was upset because Ballesteros did not hide

the nine millimeter gun and someone had gotten caught with it. Rodriquez said that he could not

recall any such statements. Rodriquez also denied telling the prosecutor and Agent Wozniak that

he remembered events "like it was yesterday" but would develop amnesia if forced to testify.

Rodriquez instead claimed that he told the prosecutor that he could not remember and he was

"wasn't going to go on the stand and lie for anybody."

Anthony Eliel testified that he was member of the Cash Flow Posse in the 1990s, that

Petitioner was an original member of that gang, and that they engaged in illegal and violent

activities. Eliel testified that he heard about the Rutland Street shooting and did not believe it

was gang related. After the shooting in late 1994 or early 1995, Petitioner gave him a nine

millimeter handgun for safekeeping. He kept it at his house, but was arrested by the DPD with that gun in his possession. Eliel also testified that three to six months after the shooting, he was in a car with Petitioner and Ballesteros and Petitioner joked that he had "popped Greg Ballesteros's cherry," meaning that he had taken Ballesteros on his first murder. On cross-examination, Eliel admitted that Petitioner never said that he participated in the Rutland Street shooting. Eliel also admitted that he had previously been convicted of larceny from a person.

FBI Agent Richard Wozniak testified that he began an investigation of the Cash Flow Posse and gang activity in southwest Detroit in 1994. He and DPD Lieutenant John Morrell began investigating the Rutland Street shooting in 1997. He interviewed Michael Crum and learned about the ten millimeter handgun that he had fired into the pine tree at his house. He arranged to have the tree cut down and a slug and several bullet fragments were recovered from the tree. Agent Wozniak testified that he and Lieutenant Morrell interviewed Marty Rodriquez in May of 1998 at the Federal Correctional Institution in Milan, Michigan. Lieutenant Morrell took notes and prepared a report. Agent Wozniak recalled that Rodriquez had told them that Petitioner "had done some shit on Rutland" and that Petitioner had told Rodriquez that he shot people on the front porch and inside the house. Rodriquez also told him that the intended targets were people with whom Jerry Waucaush had a problem and that Petitioner had shown the gun to Roger Murfik. Wozniak also interviewed Marty Rodriquez alone in September of 1998, took notes of that interview, and prepared a report. During that interview, Rodriquez reported that Petitioner was upset because Ballesteros did not hide the gun and someone got caught with it. Wozniak also recalled a discussion that he and the prosecutor had with Marty Rodriquez in which Rodriquez expressed his reluctance to testify and said that he would develop amnesia.

8

Wozniak prepared a report detailing that conversation.

On cross-examination, trial counsel asked Agent Wozniak whether Rodriquez was offered a deal with a sentence reduction to cooperate with the FBI. Wozniak replied that the federal prosecutor had agreed to make an offer, but he did not know the specifics of the offer. He said that Rodriquez was indicated on federal narcotics charges in 1995 and was offered a deal for his cooperation, but that he did not get a deal and was sentenced to 100 months without a downward departure on his sentence. Wozniak testified that he thought Michael Crum was given immunity in the federal case, but his sister was not, but reiterated that he could not recall specific deals and counsel should consult the federal prosecutor. Wozniak acknowledged that Murfik, Waucaush, and Ballesteros were given deals through the state prosecution which included an agreement to do their time in the federal system. Wozniak also agreed with defense counsel's statements that "prior to the deal they were seated in the chair where [Petitioner] is currently seated" and they were previously co-defendants in this case. Wozniak testified that he reviewed some of the DPD file, but did not follow up with any investigation of Carlos and Tony, nor did he recall reading police reports prepared by Detroit Police Officers Jeffrey Garland or Tim Broughton. Wozniak said that he did not know where the DPD file was and that he last saw it in 1997. On re-cross examination, defense counsel asked whether Marty Rodriquez had been charged or indicated on offense other than drugs. Wozniak replied that he had not been indicted and said that they were not planning on charging him for other offenses if he cooperated. Wozniak said he was not aware of any other potential charges against Rodriquez and that it was "[his] understanding that if Mr. Rodriquez gave full and complete truthful testimony regarding his gang activity, he would not be charged for those activities." Wozniak agreed with defense

counsel that "a lot of what Rodriquez had to say involved conversations with him and [Petitioner] and no one else was present."

Shirley Johnson testified about being shot on the night in question. She was in the dining room with her daughter Annie and her cousin James Goins was on the front porch at approximately 3:00 a.m. She heard someone say "Cash" and then heard gunshots. She said that it sounded like more than one gun. She was shot in the feet and thigh area. She yelled to other family members who were sleeping and went out to the porch, but did not see the shooters. When asked if anyone in her household was having a conflict with anyone in July, 1994, she replied, "yes" and said it was "two guys down the street" who were members of the Cash Flow Posse. She explained that her nephew Cortez had a dispute with the Cash Flow Posse.

On cross-examination, trial counsel asked about her police statement. Johnson recalled that one of the men involved in the dispute with Cortez, which occurred a few weeks before the shooting and concerned a young lady, was named Quick (Jerry Waucaush's nickname). She did not know of other conflicts between members of her household and others on her block. She did not recall telling the police that the shooters were possibly Mexican men named Carlos and Tony who lived north of her house. She also did not recall an incident involving her stepfather pointing a rifle at another home on her street.

Detroit Police Officer Jeffrey Garland testified that he responded to the scene of the shooting. He spoke to Shirley Gill, Shirley Johnson's 11-year-old daughter, who told him about a dispute that had occurred earlier in the day with her mother and men named Carlos and Tony. On cross-examination, trial counsel questioned Officer Garland about his police report which provided descriptions of Carlos and Tony and listed them as possible perpetrators of the

shooting. The report also indicated that Shirley Johnson screamed that the Mexicans down the street did it. On re-direct, Garland said that Carlos did not live down the street from the victims.

Detroit Police Lieutenant John Morrell testified that he worked with the FBI and Agent Wozniak on the investigation of the Cash Flow Posse. In 1997, Michael Crum gave him information about a ten millimeter handgun and said that a slug might be in a tree where he lived in 1994. After the tree was cut, he received bullet fragments removed from the tree and sent them to the lab for analysis. On cross-examination, Lieutenant Morrell testified that he copied the DPD homicide file and stored the documents at the FBI offices. He was aware that the DPD file could not be located.

Detroit Police Officer and ballistics expert David Pauch testified that the six ten millimeter casings recovered from the scene were fired from the same weapon and that the ten millimeter bullets recovered from the tree were fired from the same weapon. Pauch testified that the eight nine millimeter bullets recovered from the scene were fired from the same weapon. He further explained that he test-fired the nine millimeter gun recovered by police (from Anthony Eliel) and determined that the gun was the same one used in the Rutland Street shooting. Retired Detroit Police Officer Dale Johnston also testified about his analysis of four ten millimeter bullets and opined that they were fired from the same weapon.

Jerry Waucaush testified that he was the president of the Cash Flow Posse, that his nickname was Quick, and that Petitioner was a member of the gang. Waucaush stated that he was given a plea bargain in exchange for his testimony. He pleaded guilty to second-degree murder for the death of James Goins and was sentenced to 12 to 18 years imprisonment in federal prison. Waucaush testified that he lived on Rutland about 10 houses north of the victims'

house and that he and his brother had gotten into a dispute with people at that house a few weeks before the shooting. Petitioner subsequently told him that he thought they were members of a rival Folk gang because they wore their hats to the right. Petitioner thought "those people had to go" and Waucaush nodded in agreement. On the night of the shooting, Waucaush, Petitioner, and Ballesteros went to a Ramada Inn for a party. Waucaush stayed at the party and the other two men left. The next day, Petitioner picked up Waucaush from the party and told him that he should not go home because he and Ballesteros had done the murders and the police would be questioning Waucaush because of his prior dispute. Waucaush nonetheless went home, was arrested, and told the police that he did not have anything to do with the shooting.

When Waucaush learned that the wrong people had been shot, he was not happy and confronted Petitioner who told him that the shooting "went down like that." Petitioner also told him that he used a ten millimeter gun he got from Michael Crum, whose nickname is Deuce. Waucaush also recalled that, while at a bar, he told Scott Conn that the shooting "was messed up, but Gauge (Petitioner) leaves no witnesses." Waucaush also testified that Ballesteros had been in the Marines, was on leave at the time of the shooting, and had to prove himself because he was gone so long. Waucaush also testified that he was present at a meeting in Mexico in 1996 with several Cash Flow Posse members when Ballesteros discussed the Rutland shooting. Waucaush acknowledged that he previously had been charged with federal RICO violations, which included references to the Rutland Street shooting, and had pleaded guilty in federal court with a sentence agreement for 300 months, but the case was subsequently dismissed. He claimed he was telling the truth about the shooting and was providing the same information he gave to the FBI in 1998.

On cross-examination, trial counsel further inquired into Waucaush's plea bargains and his statements to the police. Waucaush admitted that he lied to the police about whether he knew certain individuals and whether they were members of the Cash Flow Posse. Waucaush clarified that the incident with the older man pointing a gun at his house occurred after the shooting. He recalled that his dispute with people at the victims' house occurred a few weeks before the shooting and concerned disrespectful remarks made to a woman named Nina. He admitted that the dispute appeared to be resolved, but explained that he did not like the situation because he did not know the mindset of the people down the street. He told Scott Conn, "that shit's got to go." Trial counsel also impeached Waucaush with his police statement that he saw Petitioner with a black ten millimeter a week before the shootings, even though Michael Crum testified that his gun was taken the day before the shooting. Waucaush also indicated that Petitioner "had a beef" with the people living at the victims' house and "wasn't comfortable with them living there." Trial counsel also questioned Waucaush about his federal plea. Waucaush admitted that he did not take responsibility for the Rutland Street shooting when he tendered his federal plea, but said he participated. He then testified that he ordered Petitioner to do it, but that Petitioner was going to do it anyway. He said that Petitioner told him he was going to "take out the people" when they were driving to the Ramada Inn, but it was not planned in advance. He did not remember telling the FBI this information. Trial counsel questioned Waucaush about his FBI statements. Waucaush admitted that he was confined at Milan with Ballesteros at that time, that he, Ballesteros, and Petitioner were confined together for court proceedings, and that they "talked about everything." Trial counsel further questioned Waucaush about his motivations for testifying against Petitioner and his contacts with the authorities. Waucaush admitted that he

initially lied to the police because he was trying to protect everyone.

Gregory Ballesteros testified that his nickname was Shortstop and he was a founding member of the Cash Flow Posse, as was Jerry Waucaush, the gang president. He and Petitioner were enforcers in the gang. He admitted that he was testifying at trial as part of a plea agreement in which he pleaded guilty to second-degree murder and felony firearm for the death of James Goins and was sentenced to consecutive terms of 10 to 15 years imprisonment and two years imprisonment to be served in federal prison. Ballesteros testified that he had previously been charged with several offenses in federal court, had entered a guilty plea in exchange for his cooperation, and discussed his role in the Rutland Street shooting, but the case was dismissed on jurisdictional grounds.

Ballesteros admitted that he participated in the Rutland Street shooting. Petitioner told him that the residents of that house were rival gang members. He said that Petitioner had a ten millimeter handgun and gave him a nine millimeter handgun. According to Ballesteros, they walked from a house on Grandview Street through an alley to the house on Rutland Street. As they approached the house, Petitioner pointed to the person sitting on the porch and motioned a count with his hand. Ballesteros was in the driveway on the side of the house and fired at Goins. He shot eight times "real fast" and emptied his clip. He reloaded his gun as he was running. When Ballesteros started shooting, Petitioner ran toward the front of the house, went onto the porch, stood over Goins and shot him, and then started shooting through the front door of the house. Ballesteros heard gunshots and screaming, ran into the alley, and waited for Petitioner. He and Petitioner then ran back to Petitioner's house. Petitioner took the guns and his hooded sweatshirt and put them in a doghouse. Petitioner gave him a ride home several hours later.

Ballesteros subsequently learned that Anthony Eliel was caught with the nine millimeter handgun used in the shooting. He was upset because he did not want the gun to be traced back to him. Ballesteros recalled meeting with several Cash Flow Posse members in Mexico in 1996 and telling them what he did because he was upset that a young girl had died. Ballesteros testified that he told the FBI about the shooting and admitted that he and Petitioner did the shooting when he pleaded guilty in federal court. He explained that he committed the shooting while he was on leave from the Marines because some gang members were questioning his loyalty.

On cross-examination, Ballesteros acknowledged that he had been in the Marines and received weapons and self-defense training. He confirmed that he had cooperated with the FBI to receive a 240 month sentence, which was a downward departure from the guidelines. Trial counsel questioned Ballesteros about his prior statements. Ballesteros admitted telling the FBI that he saw Petitioner with the ten millimeter handgun a few weeks before the shooting and on the night of the shooting. Ballesteros denied going to Michael Crum's house alone or with Petitioner to get the ten millimeter gun before the shooting. He testified that he went to the Ramada Inn party on the night of the shooting and that he asked Petitioner for a ride home. During that drive, Petitioner said that he should prove his loyalty to the gang and Ballesteros said that he would. Ballesteros felt that his life would be in danger if he did not do so. He and Petitioner stopped at an abandoned house on Stair Street around 12:00 or 1:00 a.m. Petitioner exited the car and retrieved a nine millimeter gun from under the porch, which he gave to Ballesteros. They then went to Petitioner's house on Rutland Street for about half an hour, where Ballesteros believed that Petitioner obtained a ten millimeter handgun. They went to a

house on Grandview Street, the initial target, by cutting through backyards and hopping fences. When they encountered a Rottweiler dog at that location, they hopped fences and walked through alleys to get to the house on Rutland Street where they committed the shooting. Trial counsel further questioned Ballesteros about his version of events, as well as his FBI statements. Ballesteros acknowledged some inconsistencies in his testimony and admitted that Petitioner did not have a dog and he did not know how long a doghouse had been in the yard. Ballesteros recalled stopping at Crum's house after the shooting and telling Jennifer Estrada to watch the news.

FBI Agent Richard Wozniak was recalled to the stand. He testified that he spoke with Gregory Ballesteros in April of 1998, that Ballesteros told him that he and Petitioner committed the shooting, and that he made a report detailing this conversation. Wozniak also confirmed that Michael Crum was in custody from July 15, 1994 to July 17, 1994.

With the Court's approval, the prosecutor read part of Ragaie Murfik's grand jury testimony into the record. In that testimony, Murfik stated that Petitioner and Gregory Ballesteros were involved in the Rutland Street shooting, that the intended targets were members of a rival Folk Nation gang, and that two people had died in the shooting. He said that Marty Rodriquez showed him a ten millimeter gun and a nine millimeter gun and he thought that Petitioner picked them up after the murders. Petitioner tried to sell the ten millimeter gun. Murfik also testified that Petitioner admitted firing the ten millimeter gun and said that Ballesteros fired and dumped his gun before he was supposed to shoot.

Petitioner did not testify at trial, nor present any defense witnesses. Trial counsel argued that Carlos and Tony were initially identified as the perpetrators, then the police did nothing on

16

the case for three years until the FBI began investigating gangs. He also argued that the prosecution witnesses were lying and were "bought and paid for" due to their plea deals, that witnesses interviewed years after the incident could not remember events accurately, and that the DPD homicide file was missing. He claimed that Petitioner had no enemies on Rutland Street and did not commit the shooting.

At the close of trial, the jury convicted Petitioner of two counts of first-degree murder, assault with intent to murder, and felony firearm. The trial court subsequently sentenced him to life imprisonment without parole on the murder convictions, a concurrent term of 20 to 40 years imprisonment on the assault conviction, and a consecutive term of two years imprisonment on the felony firearm conviction.

### III.    Procedural History and Expanded Record

Following his convictions and sentencing, Petitioner, through counsel, filed an appeal of right with the Michigan Court of Appeals asserting the following claims:

I.      The prosecutor committed reversible error and denied Petitioner due process when he presented inadmissible prior inconsistent statements, and defense counsel was ineffective for failing to object.

II.     The prosecutor impermissibly argued issues broader than guilt or innocence, denying Petitioner a fair trial.

III.    Petitioner was denied his right to the effective assistance of counsel when trial counsel failed to use information offered by an investigator from Petitioner's federal case, thereby denying Petitioner a substantial defense.

Petitioner also moved for a remand on the ineffective assistance of counsel claim. The Michigan Court of Appeals denied the motion to remand and affirmed Petitioner's convictions. *Id*. Petitioner filed an application for leave to appeal with the Michigan Supreme Court raising the same claims, which was denied in a standard order. *See People v. Garcia*, 472 Mich. 868, 692

N.W.2d 841 (2005).

Petitioner subsequently filed a motion for relief from judgment in the state trial court

raising the following claims:

I.      He was denied the effective assistance of trial counsel.

II.     He was denied his right to due process when the prosecution failed to
        disclose exculpatory information.

III.    The prosecution engaged in misconduct by failing to disclose false
        testimony.

IV.     The prosecutor engaged in misconduct by presenting evidence of the
        substance of witness Marty Rodriquez's prior statement.

V.      He was denied the right to confrontation by the admission of witness
        Ragaie Murfik's prior federal grand jury testimony.

VI.     He was denied the right to confrontation by the admission of certain
        testimony from FBI Agent Richard Wozniak.

VII.    He was denied the right to a fair trial by the admission of gang affiliation
        evidence.

VIII.   He was denied the effective assistance of appellate counsel.

The trial court denied the motion pursuant to Michigan Court Rule 6.508(D)(2) and (3),

finding that Petitioner had failed to show a retroactive change in the law as to claims previously

raised on direct appeal, had failed to show good cause for the failure to raise new issues on

appeal, and had failed to show actual prejudice. The court further explained that Petitioner had

failed to demonstrate that either trial or appellate counsel was ineffective. *See People v. Garcia*,

No. 01011952-03 (Wayne Co. Cir. Ct. April 28, 2006). Petitioner filed an application for leave

to appeal with the Michigan Court of Appeals, which was denied "for failure to meet the burden

of establishing entitled to relief under MCR 6.508(D)." *See People v. Garcia*, No. 270439

(Mich. Ct. App. Nov. 28, 2006) (unpublished). Petitioner also filed an application for leave to

appeal with the Michigan Supreme Court, which was similarly denied. *See People v. Garcia*,

477 Mich. 1112, 729 N.W.2d 874 (2007).

Petitioner thereafter instituted this federal habeas action, raising the following claims:

I.      Trial counsel was ineffective for failing to investigate or review work
        product from an investigator in his federal case.

II.     Trial counsel was ineffective for failing to procure and use transcripts of
        witnesses' prior testimony for impeachment.

III.    Appellate counsel was ineffective for failing to raise substantial issues on
        appeal.

IV.     The prosecutor committed misconduct by failing to disclose material,
        exculpatory information.

V.      The prosecutor committed misconduct by failing to report false testimony
        to the court.

VI.     The prosecutor improperly cross-examined Marty Rodriquez about his
        interviews with FBI agents in 1998.

VII.    The trial court violated his confrontation rights by admitting Regaie
        Murfik's federal grand jury testimony as substantive evidence.

VIII.   The trial court violated his confrontation rights by admitting testimony
        from FBI Agent Richard Wozniak concerning his interviews with Marty
        Rodriguez without any limiting instruction.

IX.     The trial court violated his due process rights by admitting highly
        prejudicial gang affiliation evidence.

X.      He was denied his right of access to counsel or assistance under the
        Vienna Convention on Consular Rights.

Respondent filed an answer to the petition contending that it should be denied because the claims

lack merit and/or are barred by procedural default. Petitioner filed a reply to that answer and

requested an evidentiary hearing. The Court held oral argument and ruled that the parties could

depose trial counsel about his investigation of the case and his strategic decisions. After some scheduling delays, the parties deposed trial counsel, W. Frederick Moore.

During that deposition, Moore testified that he has practiced as a criminal defense attorney for 26 years in Wayne County and has handled 120 or 125 homicide cases. He was appointed to represent Petitioner five months before trial and visited him several times. He testified that he received discovery from the prosecution before trial. That discovery included statements, investigative files, ballistics reports, medical examiner reports, reports indicating who was present at the shooting and whether anyone identified Petitioner, statements from witnesses who linked Petitioner to particular weapons, and FBI reports for various witnesses (known as 302s). He recalled that the DPD homicide file jacket was missing and not given to him, and that the trial court held a hearing in which the missing DPD file was discussed. He testified that at the time of trial, he had "pretty much everything" he expected, but he argued during trial that "the police file jacket wasn't around and we don't know what's missing, there is reasonable doubt." Moore Dep. Tr., p. 16. Moore brought trial notebooks and other materials from the trial with him to the depositions. Those notebooks contained preliminary exam transcripts, ballistic reports, medical examiner reports, FBI reports, DPD witness interviews, but no photographs. He said that he never had a case with a missing police file before, but acknowledged the concern that the prosecution has undisclosed, beneficial information.

Moore recalled that Julianne Cuneo, the investigator from Petitioner's federal case, had contacted him prior to trial. Although he could not recall the specifics of those conversations, his recollection was that he made an assessment about whether she could be beneficial. He recalled that she had investigative materials, but did not recall the volume of those materials or

whether she had the DPD file. He also did not recall whether she told him about the amount of work she had done or whether she had offered to assist him free of charge. He did not request an investigator in Petitioner's state case. Moore testified that he did not have certain crime scene photographs and statements from neighbors and other residents, but he did have statements from Shirley Johnson and Michael Crum, as well as other FBI statements and DPD reports (known as PCRs). Moore testified that Cuneo never mentioned that she had exculpatory information. He explained that the initial strategy was to present an alibi defense, but that tactic went downhill when the two co-defendants accepted deals and implicated Petitioner in the shooting. Moore admitted, however, that it was his responsibility as defense counsel to make assessments about what kind of materials are exculpatory.

Upon further questioning, Moore acknowledged that he did not have particular witness statements that were part of the DPD file and/or Cuneo's materials, including interviews of Kim Ramona Ames-Moore, Cortez Goodlow, Willie Whitehead, Shirley Gill, Douglas Cole, Christopher Cottrell, Theresa Derizans, Jason Edwards Phillips, Paul Carl McChling, Sophia Valdez, Joseph Cottrell, Daniel Scott Sizemore, Theresa Telena, Bradley James Stayer, Tammy Lynn Wyatt, Georgiana Valdez, Tina Afghan, Anthony Eliel, Kenny Allen Roland, Stephen Johnson, Nina Elizondo, and Jerry Waucaush. Moore was not sure whether he had evidence of drug use by people at the victims' house in his materials, but he did have some PCRs and/or notes which mentioned the robbery of jewelry, an argument and white car, the men named Tony and Carlos, and a conflict with Quick and the Cash Flow Posse. Moore indicated that he had some DPD reports, but not all of them.

Moore also testified that while the prosecution may have argued that the shooting

occurred because people at the victims' house were part of a rival gang, his theory was that there was a problem between two neighbors and although one was in a gang, it was not a gang issue. Moore did not know why he did not get the missing materials. He said that he and Cuneo may have discussed that she had DPD files, but he did not think that she had materials which he did not have in his possession. He did not meet with her based upon his conversations with her and his plan for Petitioner's defense.

Moore could not recall whether Cuneo told him about her own interview with Petitioner's neighbor, Mr. Quillen, who indicated that Petitioner did not have a doghouse. Moore could not recall whether he questioned Gregory Ballesteros about the doghouse. Moore testified that he did not investigate whether the nine millimeter bullet fragment recovered from Annie Johnson's body was consistent with Balleteros' testimony, but said that his mindset was that she may have been hit by one of the numerous shots that went through the wall of the house.

Moore testified that he had Jerry Waucaush's federal plea transcript at trial, that he questioned Waucaush about that plea, and that he accomplished what he wanted to accomplish. He also testified that his cross-examination of Waucaush was trial strategy in that he was trying to show that Waucaush had a beef with someone at the victims' residence but it was not gang-related. Moore recalled that Marty Rodriquez was named in a federal RICO indictment, but could not recall whether he had entered a guilty plea in that case. Moore explained that he did not further inquire into such matters because Rodriquez was in prison, was a slimy individual, and did not remember anything Petitioner had said. Moore had no independent recollection of FBI Agent Wozniak's testimony. Moore did not recall seeing any letters written by Ballesteros, Waucaush, or Rodriquez, nor remember Petitioner giving him letters.

Moore testified that he may not have had information about people in a car harassing Annie Johnson or about James Goins being attacked while riding his bicycle, but he did have information about Jerry and Robert Waucaush having a dispute with people at the victims' house. Moore agreed that evidence of the other incidents would have been helpful had Waucaush and Ballesteros not flipped and testified against Petitioner.

Moore reiterated that he did not meet with Cuneo because he had a feeling from their conversation that whatever she had was already in his possession. Moore acknowledged that he had copies of several individuals' federal plea hearings, agreements, preliminary examinations, grand jury testimony, and FBI reports.

Following Moore's deposition, the parties submitted supplemental pleadings in support of their positions. The matter is now ready for decision.

## IV.    **Standard of Review**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed his habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

While the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Additionally, a state court's factual determinations are entitled to a presumption of correctness on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

Lastly, when a state court fails to consider an issue or does not specifically address whether the alleged error constitutes a denial of a habeas petitioner's federal constitutional rights, the deference due under 28 U.S.C. § 2254(d) does not apply, and habeas review of such a claim is *de novo*. *See Higgins v. Renico*, 470 F.3d 624, 630 (6th Cir. 2006) (quoting *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003), and citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

**V.**     **Analysis**

     **A.**     **Effectiveness of Trial Counsel**

Petitioner first asserts that he is entitled to relief because trial counsel was ineffective for failing to properly investigate his case and for failing to properly impeach Gregory Ballesteros with a letter. Respondent contends that these claims lack merit because Petitioner has not shown that counsel erred and/or that he was prejudiced by counsel's conduct.

In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court set forth a two-pronged test for determining whether a habeas petitioner has received the ineffective

assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions might be considered sound trial strategy. *Id.* at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

### 1. Failure to Investigate

Petitioner asserts that trial counsel was ineffective because he failed to meet with a

private investigator, Julianne Cuneo, who worked on his federal RICO case and failed to

consider or use her files in his state criminal proceedings. Petitioner asserts that Cuneo had

copies of the missing portions of the Detroit Police Department file, as well as crime scene

photographs, statements from people who resided at the address where the shooting occurred,

statements from people who lived in the neighborhood, and information from her own

investigation of the crime. He submits an affidavit from Cuneo in support of his claims.

It is well-established that defense counsel has a duty to conduct a reasonable

investigation into the facts of a defendant's case, or to make a reasonable determination that

such investigation is unnecessary. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003);

*Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007) ; *Towns

v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005); *O'Hara v. Wiggington*, 24 F.3d 823, 828 (6th Cir.

1994). "American Bar Association standards ... also mandate counsel's duty to investigate all

leads relevant to the merits of the case." *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir.

1987); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (noting that ABA standards

provide guidance for determining the reasonableness of counsel's conduct). The duty to

investigate "includes the obligation to investigate all witnesses who may have information

concerning his or her client's guilt or innocence." *Towns*, 395 F.3d at 258. Inattention or

negligence, as opposed to reasoned strategic judgment, is inexcusable. *See Wiggins*, 539 U.S. at

526; *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992).

That being said, decisions as to what evidence to present and whether to call certain

witnesses are presumed to be a matter of trial strategy, and the failure to call witnesses or

present other evidence constitutes ineffective assistance of counsel only when it deprives a

defendant of a substantial defense. *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002). When making strategic decisions, counsel's conduct must be reasonable. *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S. at 522-23.

The state courts refused to conduct an evidentiary hearing on this issue. Limiting its review to the record, the Michigan Court of Appeals denied relief on this claim, stating:

> We are not persuaded that the affidavit from the private investigator establishes that defense counsel was ineffective. At best, it only establishes that defense counsel refused to meet with her. The record discloses that much of the information the investigator mentions in her affidavit was available to defense counsel, including the FBI's "302s" FN1 and the FBI's copy of the Detroit Police Department's file. Although the investigator also conducted interviews and background investigations, it is not apparent from the record that defense counsel did not conduct his own investigation into these same areas. Therefore, we cannot conclude that defense counsel was ineffective for failing to take advantage of the investigator's services.
>
> FN1. A "302" is a witness interview form.

*Garcia*, 2004 WL 1620844 at *4. The Michigan Court of Appeals did not reach the issue of prejudice as to this ineffective assistance of counsel claim.

As an initial matter, this Court must determine the proper standard of review to apply to this claim. The United States Court of Appeals for the Sixth Circuit has held that when new, substantial evidence supporting a habeas claim comes to light during federal court proceedings, and the threshold for admitting new evidence is met, the deferential standard of review under the AEDPA does not apply and review of the claim is *de novo*. *See Brown v. Smith*, 551 F.3d 424, 429 (6th Cir. 2008); *see also Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (stating that when "new evidence is admitted, some Courts of Appeals have conducted *de novo* review on the theory that there is no relevant state-court determination to which one could defer" and

"assuming, *arguendo*, that this analysis is correct and that it applies where . . . the evidence does not support a new claim but merely buttresses a previously rejected one"). A district court may consider new evidence on habeas review when: (1) the petitioner is not at fault for failing to develop the evidence in state court, or (2) one of the exceptions in 28 U.S.C. § 2254(e)(2) applies.

In this case, Petitioner attempted to develop a better factual record in the state courts, but the Michigan Court of Appeals denied his motion to remand for an evidentiary hearing. Because the state court refused to hold an evidentiary hearing and this Court allowed Petitioner to expand the record on habeas review by conducting Frederick Moore's deposition, the Court finds that the AEDPA deference does not apply and review of this claim is *de novo*.[1]

The record reveals that defense counsel failed to adequately investigate Petitioner's case before trial. Namely, counsel failed to meet with Julianne Cuneo and review her investigative materials. According to Cuneo's affidavit, she had performed 100 hours of work on the Rutland Street shootings, had assembled boxes of material, and offered to consult with counsel free of charge. She informed counsel about the types of documents contained in her file. Those documents included copies of the DPD file, FBI reports, crime scene photographs, and witness statements. Counsel, however, refused to meet with Cuneo or to review her files.

During his deposition, trial counsel said that he did not meet with Cuneo because, based upon their conversations, he thought that she had the same information that he already had.

---

[1]Even if the Court were to apply the AEDPA's deferential standard of review, it would find that the Michigan Court of Appeals' decision that counsel's investigative performance was not deficient was an unreasonable application of *Strickland* and the facts. In other words, under either standard of review, trial counsel's investigation of the case was deficient.

Upon further questioning, however, counsel acknowledged that, at the time of trial, he did not have several photographs, statements, and reports which were included in Cuneo's files and likely part of the missing DPD file. Counsel offered no reasonable explanation for his failure to meet with Cuneo and review her files – and the Court can think of no downside to accepting her work product, particularly since she offered her assistance free of charge. As noted, the duty to investigate includes the obligation to investigate all witnesses who may have relevant information or to determine that such investigation is unnecessary. *Towns*, 395 F.3d at 258. Trial counsel did not do so.

Counsel's lack of effort was particularly egregious in this case because he knew that he was missing some or all of the DPD homicide file. A reasonably competent attorney would have, at the very least, met with Cuneo to determine whether she had any documents which were relevant to the case and not in his possession. While such action may or may not have yielded results, counsel had a responsibility to be fully informed. Moreover, counsel did not offer a strategic reason for failing to take such action and instead turning a blind eye to the possibility that a review of Cuneo's files could lead to beneficial information for the defense. His lack of attention or negligence in this regard is inexcusable. Simply put, trial counsel did not conduct an adequate investigation of the case, relative to the investigator's reports and the missing DPD materials, before trial.

The remaining question for the Court to decide is whether trial counsel's failure to properly investigate the case prejudiced the defense. When an attorney fails to investigate and present evidence, the question is whether the evidence which was not revealed, "might well have influenced the jury's appraisal of [the petitioner's] culpability" and whether "the

likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached. . . ." *Rompilla*, 543 U.S. at 393 (internal citations and quotation marks omitted); *see also Wilson v. Parker*, 515 F.3d 682, 698-99 (6th Cir. 2008). In other words, to evaluate a claim of prejudice, the Court must assess how reasonable jurors would react to the additional evidence had it been presented. *See Avery v. Prelesnik*, 548 F.3d 434, 439 (6th Cir. 2008). Of course, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.

As previously mentioned, the Michigan Court of Appeals did not reach the issue of whether Petitioner was prejudiced by trial counsel's failure to meet with Julianne Cuneo, review her materials, and fully investigate the case given its ruling that Petitioner had not shown that counsel was deficient. Consequently, this Court must examine the prejudice component of the *Strickland* standard *de novo*. *See Avery*, 548 F.3d at 438 (citing *Rompilla*, 545 U.S. at 390; *Wiggins*, 529 U.S. at 534).

Having undertaken the requisite review, the Court concludes that Petitioner has failed to establish that he was prejudiced by counsel's deficient investigation. First, the record indicates that trial counsel had many relevant documents in his possession, including ballistics reports, autopsy reports, some DPD reports such as those from testifying officers, the FBI file, preliminary examination testimony, and materials from the federal case such as grand jury testimony and plea transcripts. Counsel utilized these materials to contest the prosecution's theory of the case, to cross-examine witnesses about their version of events, and to challenge the witnesses' credibility – including the credibility of the most damaging witnesses, Jerry

Waucaush and Gregory Ballesteros. Counsel was also able to argue that the missing police file was problematic and created reasonable doubt. Thus, despite the lack of full investigation, counsel was able to provide Petitioner with a coherent and substantial defense to the charges.

Second, Petitioner has not shown that the materials in Cuneo's files were exculpatory. For example, photographs of the crime scene, alleys, and fences, while providing a visual of the area, would neither detract from the prosecution's case nor bolster the defense. Ballesteros testified that he and Petitioner navigated such terrain and it would be reasonable to believe that young men would have no trouble with overgrowth or fencing. Furthermore, a police officer testified using a sketch of the area to describe the scene and assist the jury. Cuneo's photographs of the area, taken three or more years after the incident, would be even less useful due to the passage of time.

Similarly, the neighbor's statement indicating that Petitioner did not have a doghouse, while inconsistent with Ballesteros' testimony, may not have been accurate or relevant as Ballesteros did not pinpoint the location of the doghouse. Nonetheless, on cross-examination, Ballesteros admitted that Petitioner did not own a dog and that he did not know how long a doghouse had been in the yard. Providing additional impeachment evidence on this somewhat tangential issue would not have affected the outcome at trial.

Neighborhood interviews indicating that the victims were not known to be gang members were also not exculpatory given that the dispute that led to the shooting concerned comments made to Waucaush's girlfriend and given that Petitioner thought that the victims were associated with a rival gang. Even if the victims were not gang members, such a fact would not negate what the Cash Flow Posse members believed or how they reacted, nor would

it refute the evidence that Petitioner and Ballesteros committed the shooting.

Reports of other disputes in the neighborhood involving the victims would have normally been highly relevant and potentially exculpatory, but their value in this case was significantly, if not completely, diminished by the two co-defendants' acceptance of second-degree murder pleas and their testimony inculpating Petitioner. This is particularly so when that testimony is combined with the evidence linking Petitioner to the guns used in the shooting. Moreover, the record reveals that counsel elicited testimony from witnesses that men named Carlos and Tony were initially identified as possible perpetrators of the shooting, and the police and FBI did not further investigate them. Eliciting additional evidence about relatively minor disturbances in the neighborhood or the victims' drug usage would not have benefitted the defense. In fact, it appears from witness statements that some of those matters also involved Cash Flow Posse members. Given the testimony that Petitioner and Ballesteros were gang enforcers, such information would have been detrimental, rather then beneficial, to the defense.

Third, Petitioner has not shown that the materials in Cuneo's files would have made a difference at trial or influenced the jury's verdict in light of the fact that the prosecution presented such significant evidence of Petitioner's guilt at trial. That evidence included testimony from co-defendants Waucaush and Ballesteros identifying Petitioner as one of the perpetrators of the Rutland Street shooting, as well as testimony from several other witnesses linking Petitioner to the guns used in the shooting and recounting his admissions about the shooting. Petitioner has thus failed to demonstrate that he was prejudiced by counsel's deficiencies in investigating his case. Consequently, he has not established that trial counsel was ineffective under the standard set forth in *Strickland*. Habeas relief is not warranted.

33

## 2.        Impeachment of Ballesteros

Petitioner also asserts that counsel was ineffective for failing to impeach Gregory

Ballesteros with a November 26, 2001 letter that he purportedly wrote to a man named Johnny

in which he said he lied to the police about an unrelated murder.[2]  As noted, decisions as to

what evidence to present and whether to call certain witnesses are presumed to be a matter of

trial strategy, and the failure to call witnesses or present other evidence constitutes ineffective

assistance of counsel only when it deprives a defendant of a substantial defense.  *See*

*Chegwidden*, 92 F. App'x at 311; *Hutchison*, 303 F.3d at 749.  Counsel's strategic decisions,

however, must be reasonable.  *See Roe*, 528 U.S. at 481.

The Michigan Court of Appeals denied relief on this claim, stating:

> Defendant also argues that defense counsel should have used a letter that
> Ballesteros wrote to another gang member in which Ballesteros admitted to lying
> about that gang member in order to reach a plea agreement. Even assuming that
> Ballesteros wrote the letter, the record does not indicate that defense counsel
> received the letter before trial, nor has defendant made an offer of proof in this
> regard. Therefore, we cannot conclude that counsel was ineffective in this
> regard.

*Garcia*, 2004 WL 1620844 at *4.

This decision is neither contrary to *Strickland* nor an unreasonable application thereof.

First, the record is unclear whether Ballesteros actually wrote the letter and whether counsel had

the letter in his possession at the time of trial.  At his deposition, counsel could not recall

whether Petitioner had given him the letter (or any others) before trial.  *See* Moore Dep., pp. 82-

83.  Second, even assuming that counsel had the letter at the time of trial, he may have

_____

[2]Petitioner also asserts that counsel was ineffective for failing to impeach Ballesteros in
other ways.  Those issues were first raised in Petitioner's motion for relief from judgment,
however, and will be addressed with his other defaulted claims.  *See* discussion *infra*.

reasonably decided not to use it due to concerns about its authenticity or admissibility, as well as its prejudicial effect given that it concerned another gang-related crime and could lead to further evidence of gang activity. Moreover, the fact that Ballesteros may have lied about another crime so that he could be released and go home cuts two ways. While it shows that Ballesteros was willing to lie to police to avoid conviction, it also serves as a contrast to the present case where Ballesteros was willing to admit his role in the shooting and accept a second-degree murder plea. Third, even assuming that counsel erred, Petitioner cannot establish that he was prejudiced. Trial counsel questioned Ballesteros extensively about his plea deal, his version of events, and his role in the gang. Consequently, the jury was well aware of Ballesteros' potential bias and motivation for testifying at trial. Petitioner has failed to establish that counsel was ineffective in this regard. Habeas relief is not warranted on this claim.

### B. Procedural Default of Claims

Petitioner also asserts that he is entitled to habeas relief because trial counsel failed to properly question prosecution witnesses and and use transcripts of prior testimony to impeach those witnesses, the prosecution failed to disclose exculpatory information, the prosecution failed to correct false testimony, the prosecution erred in presenting the substance of witness Marty Rodriquez's prior statement, the admission of witness Ragaie Murfik's prior federal grand jury testimony and testimony from FBI Agent Richard Wozniak regarding Marty Rodriquez's statements violated his confrontation rights, the trial court erred in admitting gang affiliation evidence, and he was denied his rights under the Vienna Convention on Consular Rights. Respondent contends that these claims are barred by procedural default because

Petitioner first presented them to the state courts on collateral review of his convictions and those courts relied upon a state procedural bar to deny him relief.

Federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977). The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *see also Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell,* 244 F.3d 533, 539 (6th Cir. 2001). "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last *explained* state court judgment should be used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id*.

Petitioner first presented these claims to the state courts in his motion for relief from judgment. The Michigan Supreme Court denied relief pursuant to Michigan Court Rule 6.508(D), which provides, in part, that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom. *See* Mich. Ct. R. 6.508(D)(3). The Michigan Supreme Court's decision, while brief, was based upon an independent and adequate state procedural

rule. *See Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000) (Michigan Supreme Court's citation to MCR 6.508(D) to deny relief constitutes a reasoned decision invoking a procedural bar); *see also Alexander v. Smith*, 311 F. App'x 875, 883-84 (6th Cir. 2009) (confirming that *Simpson* is binding precedent); *cf. Ivory v. Jackson*, 509 F.3d 284, 292-93 (6th Cir. 2007), *cert. den.* 128 S. Ct. 1897 (2008) (ruling that it may be appropriate to look to the state trial court's decision denying a motion for relief from judgment to determine whether the appellate courts relied upon a procedural default in denying relief pursuant to MCR 6.508(D)); *Abela v. Martin*, 380 F.3d 915, 921-23 (6th Cir. 2004) (distinguishing case where Michigan Court of Appeals denied relief for lack of merit). In this case, the Michigan Supreme Court relied upon a state procedural default in denying relief on these claims.[3]

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 753; *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).

Petitioner asserts ineffective assistance of appellate counsel as cause to excuse the procedural default of these claims. Petitioner, however, has not shown that appellate counsel was ineffective. In order to establish ineffective assistance of counsel, Petitioner must show "that counsel's performance was deficient . . . [and] that the deficient performance prejudiced

---

[3]Moreover, in this case, the state trial court found that trial and appellate counsel were not ineffective and that Petitioner had not established good cause for his failure to previously raise the claims or actual prejudice as required under MCR 6.506(D)(3). The Michigan Court of Appeals also denied relief pursuant to MCR 6.508(D).

the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *O'Hara v. Wigginton*, 24

F.3d 823, 828 (6th Cir. 1994). In determining whether counsel's performance was deficient,

> [t]he court must ... determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance .... At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland*, 466 U.S. at 690. Therefore, judicial scrutiny of counsel's performance must be

"highly deferential." *Id*. at 689. The defense is prejudiced only if "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Id*. at 694.

It is well-established that a criminal defendant does not have a constitutional right to

have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S.

745, 751 (1983). The Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the ... goal of vigorous and effective advocacy .... Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754.

Strategic and tactical choices regarding which issues to pursue on appeal are "properly

left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59

(6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of

'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail."

*See Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52).

"Generally, only when ignored issues are clearly stronger than those presented will the

presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281

F.3d 568, 579 (6th Cir. 2002).  Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," defined as an issue which was obvious from the trial record and would have resulted in reversal on appeal.  *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Petitioner has failed to show that by omitting the claims presented in his motion for relief from judgment appellate counsel's performance fell outside the wide range of professionally competent assistance.  Appellate counsel presented legitimate and viable issues, including a challenge to the effectiveness of trial counsel, on direct appeal.  Petitioner has not shown that appellate counsel's strategy in presenting such claims and not raising the claims contained in the motion for relief from judgment was deficient or unreasonable.  Petitioner has thus failed to demonstrate that appellate counsel was ineffective so as to establish cause to excuse his procedural default.

A federal court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default.  *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).  Nonetheless, the Court notes that Petitioner's defaulted claims lack merit for the reasons stated *infra*.

Lastly, Petitioner has not established that a fundamental miscarriage of justice has occurred.  The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent.  *See Schlup v. Delo,* 513 U.S. 298, 326-27 (1995).  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 624 (1998).  "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with

new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner has made no such showing. These claims are thus barred by procedural default, lack merit, and do not warrant habeas relief.

### C.     Merits of Defaulted Claims

#### 1.     Effectiveness of Trial Counsel - Impeachment of Witnesses

Petitioner asserts that trial counsel failed to properly question prosecution witnesses and use transcripts of prior testimony to impeach those witnesses. As noted, decisions as to what evidence to present and whether to call certain witnesses are presumed to be a matter of trial strategy, and the failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *See Chegwidden*, 92 F. App'x at 311; *Hutchison*, 303 F.3d at 749. Of course, counsel's strategic decisions must be reasonable to pass constitutional muster. *See Roe*, 528 U.S. at 481.

Petitioner first claims that counsel failed to impeach witness Jerry Waucaush's testimony that he ordered the shooting with his federal testimony denying knowledge of the shooting prior to its occurrence. This claim is belied by the record. On cross-examination, trial counsel questioned Waucaush about his federal plea and asked whether Waucaush took any responsibility for the shooting. Waucaush replied "no." *See* Tr. 8/22/02, p. 109. Upon further questioning by trial counsel, Waucaush admitted that he ordered Petitioner to do it. *Id*. The record thus indicates that counsel questioned Waucaush about this inconsistency. Petitioner has failed to establish that trial counsel erred.

Petitioner relatedly claims that counsel failed to impeach Waucaush's testimony that

Petitioner told him that people associated with the victims were members of a rival Folk gang with his federal testimony to the contrary. Petitioner misconstrues the record on this point. At trial, Waucuash testified that he and his brother had a dispute with people who lived at the victims' house a few weeks before the shooting, that Petitioner told him he believed they were members of a rival gang based upon how they wore their hats, and that he and Petitioner discussed eliminating people at that house. *See* Tr. 8/22/02, pp. 71-73. During the federal proceeding, Waucaush merely said that he did not believe that the residents at that address were members of a Folk gang. Such testimony is not inconsistent. The fact that Waucaush may not have thought that the residents were rival gang members does not mean that Petitioner did not believe so and communicate his belief to Waucaush. Counsel may have reasonably determined that delving into this matter further was unnecessary, would be futile, and/or could lead to more damaging testimony. Petitioner has not shown that counsel was ineffective.

Petitioner next claims that counsel failed to contest Marty Rodriquez's and Agent Wozniak's testimony that Rodriquez was only charged in a federal drug case with evidence that Rodriquez had been charged in a federal RICO indictment and was allegedly involved in a plot to murder a federal agent and federal prosecutor. Petitioner has failed to establish that counsel erred or that he was prejudiced in this regard. First, Petitioner has not shown that counsel was aware or should have been aware of such information. Second, assuming that counsel had the information at his disposal, counsel may have reasonably decided that such impeachment was unnecessary. Marty Rodriquez claimed a loss of memory as to most of the prosecutor's questions and did not provide incriminating testimony about the shooting or Petitioner at trial (although the prosecutor attempted to impeach him with prior statements). Rather than

attacking Rodriquez, counsel instead relied upon Rodriquez's testimony that the government was pressuring him to testify and he was "not going to lie for anybody." Given the circumstances, this tactic was reasonable. This Court will not second-guess counsel's strategy. Lastly, the Court notes that Agent Wozniak testified that he believed that Rodriquez was offered a deal, but he did not know the particulars. Wozniak also said that Rodriquez was serving 100 months for a drug offense and was not given a reduced sentence. Further inquiry into possible unrelated charges against Rodriquez was thus of marginal relevance and questionable admissibility, particularly since Rodriquez did not provide incriminating evidence. Petitioner has not shown that trial counsel was ineffective under the *Strickland* standard.

Petitioner also claims that counsel failed to impeach Gregory Ballesteros with a police report which indicated that a nine-millimeter bullet fragment was removed from Annie Johnson's body. Petitioner, however, cannot establish that counsel erred and/or that he was prejudiced by counsel's conduct. Counsel may have reasonably determined that such a measure would be futile given the evidence that ten millimeter bullets were removed from Annie Johnson, Shirley Johnson, and James Goins, nine millimeter bullets were removed from James Goins, ten millimeter bullets were recovered from the porch area and inside the house, and nine millimeter casings were recovered from the driveway. In other words, Ballesteros' account of the shooting was consistent with the ballistics evidence. Moreover, given that Ballesteros testified that he quickly fired eights shots toward the porch while on the move, it would not be unreasonable or beyond the realm of physics to believe that one of his bullets entered the house, perhaps through a broken window. Additionally, the record indicates that counsel cross-examined Ballesteros extensively about his background, his version of events, inconsistencies

in his prior statements and testimony, his plea deal, and his motivation for testifying. Counsel clearly had a strategy for questioning Ballesteros and challenging his credibility. Petitioner has failed to establish that counsel was ineffective.

Lastly, Petitioner claims that counsel failed to use materials from the prosecutions of Murfik, Waucaush, Ballesteros, and Rodriquez to question those witnesses about their opportunities to coordinate their stories about the crime. This claim lacks merit. While trial counsel did not question all of these witnesses about such matters extensively, he did question Waucaush and Ballesteros about their confinement. In fact, Waucaush testified that he was confined at Milan with Ballesteros, that he, Ballesteros, and Petitioner were held in lockup together during court proceedings, and that they "talked about everything." *See* Tr. 8/22/02, pp. 125-27, 134. Additonally, FBI Agent Wozniak testified the Rodriquez, Murfik, Waucaush, and Ballesteros were all offered plea agreements and that Rodriquez and Ballesteros were confined together at Milan when he spoke to them in 1998. *See* Tr. 8/21/02, pp. 189-90, 198-200; 8/26/02, pp. 52-53. The jury was thus well aware that the gang members had reason to lie to the authorities and had ample opportunity to coordinate their stories. Petitioner has not shown that counsel erred by not further belaboring the point, nor has he shown that he was prejudiced by counsel's conduct. Habeas relief is not warranted on this claim.

### 2.    Non-Disclosure of Information

Petitioner asserts that the prosecutor engaged in misconduct by failing to disclose the entire Detroit Police file, which he believes contained potentially exculpatory information. According to Petitioner, reports of police interviews with people who resided in the area of the shooting would have shown that the victims were not known to be affiliated with gang activity

and that other people in the area had disputes with the victims or people associated with them.

The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). It is well-settled, however, that there is no general constitutional right to discovery in a criminal case. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988). The United States Supreme Court has held that the prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In other words, to find a *Brady* violation, not only must the evidence be suppressed, but the suppressed evidence must be material and favorable to the accused. *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir. 1985). Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432-36 (1995). Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993). The duty to disclose favorable evidence includes the duty to disclose impeachment evidence. *Bagley, supra*; *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

The *Brady* rule only applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also Mullins v. United States*, 22 F.3d 1365, 1370-71 (6th Cir. 1994).

Moreover, a *Brady* violation does not occur if previously undisclosed evidence is disclosed during trial unless the defendant is prejudiced by the delay in disclosure. *See United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986). Thus, in order to establish a *Brady* violation, a petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to the petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of the petitioner's guilt. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The petitioner bears the burden of establishing a *Brady* violation. *Carter*, 218 F.3d at 601.

Petitioner has not met his burden of establishing a *Brady* violation. First, Petitioner has failed to establish that the disputed materials were not disclosed in part and/or were not available from another source. The materials were part of the DPD file, which was in whole or in part provided to the FBI. Although the DPD file was lost, the FBI file was disclosed to the defense. *See* Tr. 7/19/02, pp. 7-14. In fact, the record reflects that defense counsel questioned witnesses about the federal case. *See* Tr. 8/21/02, pp. 38-39, 43, 75, 126-30; 8/22/02, pp. 89-92, 95, 109-12, 132, 138, 171; 8/26/02, pp. 8, 14-15, 27-29, 37-40. Counsel also referenced some DPD reports. *See* Tr. 8/21/02, pp. 207-08. Furthermore, while trial counsel's deposition indicates that some of the documents were not given to him (or were not reviewed by him) at the time of trial, *see, e.g.,* Moore Dep. pp. 27-58, there is no indication that the prosecution intentionally withheld any documents or exculpatory information. The fact that the DPD file was missing was disclosed to the defense and was the subject of several pre-trial hearings. *See* Tr. 5/17/02, pp. 27-53; 7/19/02, pp. 7-15, 7/25/02, pp. 7-10. Most importantly for purposes of

45

federal habeas review, Petitioner admits that the missing materials were available from another source – the investigator who worked on his federal case. This undisputed fact is fatal to his *Brady* claim.

Second, Petitioner has not shown that the missing materials were exculpatory. For example, Petitioner claims that the neighborhood interviews show that the victims were not known to be affiliated with gang activity and that other people had disputes with the victims or people associated with them. However, the fact that the victims were not known to be gang members did not contradict what the Cash Flow Posse members thought or how they reacted. The trial testimony indicated that Petitioner believed that people at the victims' house were members of a rival gang due to the way they wore their hats. Showing that neighbors did not think that the victims were gang members would have no impact on Petitioner's views, his own gang membership, or the evidence establishing that he and Ballesteros committed the shooting. Additionally, while reports of other disputes would potentially be exculpatory, their value in this case was diminished by the co-defendants' second-degree murder pleas and testimony identifying Petitioner as one of the shooters, and by the testimony linking Petitioner to the guns used in the shooting.[4] Given such circumstances, Petitioner has not shown that there is a reasonable probability that, had any of the missing material been previously disclosed to the defense, the result of the proceeding would have been different. The Court thus concludes that Petitioner has failed to demonstrate that the prosecution violated his constitutional rights or

---

[4]Nonetheless, the Court notes that Petitioner had some information about other suspects, *i.e.*, Carlos and Tony, and other disputes available to him at the time of trial. The jury was also informed about the missing DPD file, which allowed defense counsel to challenge the quality of the police investigation and argue reasonable doubt. *See* Tr. 8/21/02, p. 211; 8/22/02, pp. 39-40; 8/26/02, pp. 105-08.

deprived him of a fundamentally fair trial.  Habeas relief is not warranted on this claim.

### 3.    Presentation of False Testimony

Petitioner also asserts that the prosecutor engaged in misconduct by presenting false testimony.  Specifically, he claims that FBI Agent Wozniak provided false information about Marty Rodriquez's prior charges, plea offer, and dealings with the authorities and that the prosecution failed to correct the inaccurate information.

The United States Supreme Court has made clear that the "deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice."  *Giglio v. United States*, 405 U.S. 150, 153 (1972).  It is thus well-settled that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted); *see also Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).  A habeas petitioner bears the burden of proving that the disputed testimony constituted perjury.  *Napue*, 360 U.S. at 270.  To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew that the statements were false.  *Coe*, 161 F.3d at 343; *see also Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005).

In this case, the trial transcript reflects that Agent Wozniak testified as to his own personal knowledge of possible federal and state charges against Marty Rodriquez and the fact that Rodriquez was offered a plea at one point.  Wozniak indicated that he was not sure of all

the details of such proceedings and referred defense counsel to the federal prosecutor for more information. The fact that Agent Wozniak was unable to recall specifics or may have been mistaken about such matters does not mean that he committed perjury. Petitioner has failed to demonstrate that Agent Wozniak's testimony was false, rather than simply based upon a lack of knowledge or an uncertain memory. "While a prosecutor may not knowingly use perjured testimony, a prosecutor is not required to ensure that prosecution witnesses' testimony be free from all confusion, inconsistency, and uncertainty." *Jackson v. Lafler*, No. 06-CV-15676, 2009 WL 1313316, *12 (E.D. Mich. May 11, 2009). The record does not demonstrate that the witness provided false testimony, that the prosecutor purposefully elicited false testimony or misrepresented the facts, or that the prosecutor knowingly failed to correct false testimony.

Furthermore, to the extent that the prosecutor erred in failing to correct any misstatements or inaccuracies, there is no reasonable likelihood that the same affected the judgment of the jury. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 117-18 (2007) (confirming that *Brecht* standard applies in "virtually all" habeas cases); *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995) (habeas court should grant petition if it has "grave doubt" about whether trial error had substantial and injurious effect or influence upon the jury's verdict); *Ruelas v. Wolfenbarger*, 580 F.3d 403 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in this circuit); *Carter v. Mitchell*, 443 F.3d 517, 537 (6th Cir. 2006) (applying *Brecht* analysis to claimed *Giglio* violation).

In this case, Marty Rodriquez claimed a loss of memory at the time of trial as to most of

the prosecutor's questions and did not provide incriminating testimony about the shooting (although he was impeached with his prior statements). Additionally, the jury was well aware of Rodriquez's potential bias and/or motivation for speaking with the authorities and possibly implicating Petitioner in the shootings. The record shows that he was offered a deal at one point and that he served 100 months on federal drug charges, but was not being prosecuted on other charges at the time of trial. Lastly, and most significantly, the prosecution presented significant evidence of Petitioner's guilt, *e.g.* the testimony of Ballesteros and Waucaush, at trial. The Court thus concludes that any error by the witness or the prosecutor in this regard was harmless beyond a reasonable doubt. Habeas relief is not warranted on this claim.

### 4. Impeachment of Marty Rodriquez with Prior Statements

Petitioner next asserts that the prosecution erred by impeaching witness Marty Rodriquez with his prior inconsistent statements. At trial, Rodriquez testified that he did not remember the events at issue and did not recall whether Petitioner made statements to him about the Rutland Street shooting. The prosecution then impeached Rodriquez with prior contrary statements that he made to the FBI.

As an initial matter, to the extent that Petitioner asserts a violation of the Michigan Rules of Evidence, he is not entitled to relief from this Court. A state court's alleged failure to properly apply state law, even if well-established, is not cognizable on federal habeas review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (state courts are the final arbiters of state law); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). State courts are the final arbiters of state law and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo*, 809 F.2d at 328.

Additionally, alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Petitioner asserts that the introduction of Rodriquez's prior statements violated due process because the prosecution used those statements as substantive evidence. This claim lacks merit. Federal Rule of Evidence 607, which mirrors Michigan Rule of Evidence, states that the credibility of a party may be attacked by any party, including the party calling the witness. While Federal Rule of Evidence 607 is not controlling in a state trial, the rule provides "persuasive evidence that allowing the prosecutor to impeach his own witnesses does not rise to a constitutional violation meriting habeas corpus relief." *Lyle v. Koehler*, 720 F.2d 426, 429 (6th Cir. 1983) (quoting district court).

Evidence of a prior inconsistent statement of a hostile prosecution witness may be admitted for the purpose of impeaching the witness, even though the statement tends directly to inculpate the defendant. *See United States v. Bailey*, 831 F.2d 297, 1987 WL 44974, *6 (6th Cir. Oct. 6, 1987) (citing *United States v. Miller*, 664 F.2d 94, 97 (5th Cir. 1981)); *see also United States v. Stone*, 13 F. App'x 342, 344 (6th Cir. 2001); *United States v. Yuill*, No. 90-3044, 1990 WL 130484, *3 (6th Cir. Sept. 11, 1990). A prosecutor, however, may not use the prior inconsistent statement of a prosecution witness which tends to directly inculpate the defendant, under the guise of impeachment, for the primary purpose of placing before the jury

substantive evidence that is otherwise inadmissible. *Miller, supra*. A prosecutor may impeach a government witness if he or she "calls the witness in good faith anticipation that he will give useful testimony." *Bailey, supra* (citing *United States v. Webster*, 734 F.2d 1191, 1192-93 (7th Cir. 1984)).

While the record indicates that Rodriquez expressed reluctance to testify, Petitioner has offered no evidence to show that the prosecutor called Rodriquez to the stand in bad faith in order to introduce his prior statements under the guise of impeachment. To the contrary, it appears that Rodriquez was offered a plea agreement at one point which required him to provide truthful testimony and could have been given reduced time in federal prison if he had cooperated. The record thus supports a finding that the prosecution called Rodriquez to testify in good faith and not for the purpose of introducing inadmissible evidence. Moreover, the record indicates that the trial court instructed the jury on the proper consideration of such evidence. *See* Tr., 8/26/02, pp. 136-37. Jurors are presumed to follow the court's instructions. *See United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as charged, and they are expected to follow it."). Petitioner has failed to establish that the trial court erred or that prosecutor's conduct rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### 5. Admission of Ragaie Murfik's Grand Jury Testimony

Petitioner also asserts that the trial court erred and violated his confrontation rights by admitting witness Ragaie Murfik's prior federal grand jury testimony. Murfik testified that he thought the shooting was gang-related because the intended targets were considered to be part of a Folk Nation rival gang. He testified that he spoke with Marty Rodriquez about the

shooting, but said he could not remember whether he spoke to Petitioner about the shooting even though he said so before the grand jury. The prosecution used his grand jury testimony to refresh his recollection. Murfik then testified that Petitioner had tried to sell him a ten millimeter handgun, but he did not buy it because thought it had been used in the shooting.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. Const. amend. VI. The Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him. *Davis v. Alaska*, 415 U.S. 308, 315 (1973). The Confrontation Clause is not violated, however, when a declarant who made challenged hearsay statements testifies at trial and is available for the defendant to confront. *See Nelson v. O'Neil*, 402 U.S. 622, 626-27, 629-30 (1971); *California v. Green*, 399 U.S. 149, 161 (1970) ("none of our decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial").

The record reveals that Murfik testified at trial and was subject to cross-examination about his prior grand jury testimony. Petitioner has thus failed to establish a violation of his confrontation rights. Nor has he shown that the use of the grand jury testimony rendered his trial fundamentally unfair. Petitioner was able to cross-examine Murfik and question him about prior statements and any conflicts with his trial testimony. Moreover, the trial court instructed the jury on the proper consideration of such evidence. *See* Tr., 8/26/02, pp. 136-37. As noted, jurors are presumed to follow the court's instructions. *See Powell*, 469 U.S. at 66 (1984). Petitioner has not shown that the use of Murfik's grand jury testimony rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### 6. Admission of Testimony from FBI Agent Wozniak

Petitioner relatedly asserts that the trial court erred and violated his confrontation rights by admitting testimony from FBI Agent Wozniak regarding Marty Rodriquez's prior statements to the FBI. To the extent that Petitioner asserts that the trial court erred in admitting the statements under the Michigan Rules of Evidence, he merely alleges a violation of state law which does not entitle him to federal habeas relief. *See Wheeler*, 59 F. App'x. at 28. As noted, state courts are the final arbiters of state law and the federal courts will not intervene in such matters. *See, e.g., Lewis*, 497 U.S. at 780; *Oviedo*, 809 F.2d at 328.

Petitioner has also failed to establish a violation of his confrontation rights given that Rodriquez testified at trial and was available for cross-examination. *See Nelson*, 402 U.S. at 626-27, 629-30; *Green*, 399 U.S. at 161. Lastly, Petitioner has not shown that the admission of this testimony rendered his trial fundamentally unfair, particularly given that the trial court instructed the jury about the proper consideration of such evidence. *See* discussion *supra*. Habeas relief is not warranted on this claim.

### 7. Admission of Gang Affiliation Evidence

Petitioner next asserts that the trial court erred in admitting evidence of gang affiliation and gang activity during the trial. In particular, Petitioner objects to testimony from several witnesses about the activities of the Cash Flow Posse and Petitioner's membership and role in that organization.

As noted, alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle*, 502 U.S. at 67-68; *Serra*, 4 F.3d at 1354. Only when an evidentiary ruling is "so egregious that it results in a

denial of fundamental fairness," may it violate due process and warrant habeas relief. *See Bugh*, 329 F.3d at 512. Petitioner has made no such showing.

First, as to the admission of prior acts, the United States Supreme Court has declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental concepts of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990).[5] Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512. Consequently, there is no Supreme Court precedent that the state court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Id.* at 513; *see also Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003). Moreover, any claim that the state trial court violated Michigan Rule of Evidence 404(b) by admitting the other acts evidence is not cognizable on habeas review. *See Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007). Petitioner has failed to state a claim upon which habeas relief may be granted as to this issue.

Furthermore, to the extent that Petitioner states a cognizable claim in this regard, he is not entitled to relief. Petitioner has not shown that the disputed evidence rendered his trial fundamentally unfair. The United States Supreme Court has held that the admission of gang affiliation testimony may be appropriate when it is probative of a witness's bias toward a defendant. *See United States v. Abel*, 469 U.S. 45, 49 (1984) (government could impeach defense witness by showing that he and defendant were members of same gang whose members

---

[5]While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

were sworn to lie on behalf of each other). In keeping with *Abel*, federal courts have ruled that gang affiliation evidence is admissible only when it is relevant to a material issue in the case. *See United States v. Anderson*, 333 F. App'x 17, 24 (6th Cir. 2009); *United States v. Takahashi*, 205 F.3d 1161, 1164 (9th Cir. 2000). For example, gang affiliation evidence may be admissible to establish identity, *United States v. Easter*, 66 F.3d 1018, 1021 (9th Cir. 1995), an element of the crime such as with a conspiracy, *United States v. Brown*, 200 F.3d 700, 708 (10th Cir. 1999), opportunity, *United States v. Jobson*, 102 F.3d 214, 221 (6th Cir. 1996), motive, intent, or plan, *Snell v. Lockhart*, 14 F.3d 1289, 1299 (8th Cir. 1994); *United States v. Hawkins*, 823 F.2d 1020, 1023 (7th Cir. 1987); *Briggs v. Makowski*, No. 00-70704-DT, 2000 WL 1279168, *4 (E.D. Mich. Aug. 18, 2000), the relationship between parties, *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999), or for impeachment such as establishing a witness's fear, *United States v. Keys*, 899 F.2d 983, 987 (10th Cir. 1990).

In this case, evidence of Petitioner's gang affiliation and his role in the Cash Flow Posse was relevant and admissible. Such evidence established his identity, his intent and motive for the shootings, his relationships and interactions with co-defendants Ballesteros and Waucaush, and his connections to other witnesses who testified at trial. Such testimony was properly admitted under state law for those purposes and the prosecution did not make an improper character or propensity argument based on the evidence. Petitioner has not shown that the admission of this evidence was erroneous or, more importantly, that it rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### 8. Vienna Convention Rights

Petitioner further asserts that he is entitled to habeas relief because he was denied his

rights under the Vienna Convention. The United States Court of Appeals for the Sixth Circuit, however, has held that the Vienna Convention does not create an individual right for a detained foreign national to consult with the diplomatic representatives of his nation which the federal courts can enforce. *See United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001); *see also United States v. Garcia-Perez*, 190 F. App'x 461, 465-66 (6th Cir. 2006) (citing *Emuegbunam*); *accord Cardenas v. Dretke*, 405 F.3d 244 (5th Cir. 2005); *Mendez v. Roe*, 88 F. App'x 165 (9th Cir. 2004); *Diaz v. Van Norman*, 351 F. Supp. 2d 679, 681 (E.D. Mich. 2005). Although some courts have reached a contrary conclusion, *see, e.g., Jogi v. Voges*, 480 F.3d 822, 834 (7th Cir. 2007), the United States Supreme Court has not decided this question, *see Loza v. Mitchell*, _ F.2d _, 2010 WL 1384513, *21-24 (S.D. Ohio March 31, 2010), *Jacko v. Michigan State Police*, No. 2:07-CV-11292, 2007 WL 1017648, *2 (E.D. Mich. March 30, 2007); *see also Sanchez-Llamas v. Oregon*, 548 U.S. 331, 343 (2006) (finding it unnecessary to resolve whether the Vienna Convention creates enforceable individual rights because, assuming it does, suppression of evidence through the exclusionary rule was not appropriate remedy for authorities' failure to notify consular office of alien's arrest); *Breard v. Greene*, 523 U.S. 371, 376 (1998) (assuming without deciding that an individual right exists and finding claim procedurally defaulted), and this Court is bound by the law of the Sixth Circuit. Accordingly, the Court concludes that Petitioner has failed to state a claim upon which relief may be granted as to this issue. Habeas relief is not warranted on this claim.

### D. Effectiveness of Appellate Counsel

Lastly, Petitioner asserts that he is entitled to habeas relief because appellate counsel was ineffective for failing to raise the foregoing defaulted issues on direct appeal in the state

courts. Petitioner, however, is not entitled to habeas relief on any independent claim challenging appellate counsel's conduct. As explained *supra*, the defaulted claims lack merit and Petitioner has not shown that appellate counsel was ineffective under the *Strickland* standard. Habeas relief is therefore not warranted on this claim.

## VI.    Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition and the petition must be denied.

Before Petitioner may appeal this decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id*. at 336-37. When a court denies a habeas claim on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484-85.

The Court concludes Petitioner has made a substantial showing of the denial of a constitutional right as to his non-defaulted ineffective assistance of trial counsel claim concerning counsel's investigation of his case. The Court further concludes, however, that he has not made a substantial showing of the denial of a constitutional right as to his remaining claims and reasonable jurists would not find the procedural ruling on those claims debatable.

Accordingly;

**IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED.**

**IT IS FURTHER ORDERED** and that a certificate of appealability is **GRANTED** as to the non-defaulted ineffective assistance of trial counsel investigation claim and **DENIED** as to the remaining claims.


DATED: December 3, 2010                  **s/Anna Diggs Taylor**
                                         ANNA DIGGS TAYLOR
                                         UNITED STATES DISTRICT JUDGE

---

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order of Dismissal was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on December 3, 2010.


                                         s/Johnetta M. Curry-Williams
                                         Case Manager